CLERKS OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

7/28/2017

JULIA C. DUDLEY, CLERK
BY: s/ JODY TURNER
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and COMMONWEALTH OF VIRGINIA, SECRETARY OF NATURAL RESOURCES, | ) ) ) ) | |
| | ) | Case No. 5:16-cv-00082 |
| Plaintiffs, | ) ) | |
| v. | ) ) | By: Michael F. Urbanski Chief U.S. District Judge |
| E.I. du PONT de NEMOURS AND CO., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Many years ago, between 1929 and 1950, defendant E.I. du Pont de Nemours and Co. ("DuPont") used mercury in the manufacture of acetate fibers at its plant bordering the South River in Waynesboro, Virginia. A quarter century later, mercury was detected in the South River downstream of the plant. Since that time, many have toiled to remedy the mercury contamination problem. The proposed Consent Decree filed in the instant case is a part of that effort, focusing on natural resource damages.

It is important to note at the outset that the proposed Consent Decree does not concern remediation of the mercury contamination under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq.. Permitted corrective actions are ongoing to remediate the mercury released in Waynesboro. Both in the Joint Memorandum in Support of Motion to Enter, ECF No. 24, and in evidence presented at the public hearing on June 2, 2017, the parties outlined the substantial efforts being made to remediate the site

of the mercury contamination.[1]  These continuing remediation efforts are beyond the purview of the proposed Consent Decree, which exclusively concerns the separate issue of natural resource damages.

## I.

On December 15, 2016, plaintiffs United States of America and Commonwealth of Virginia, Secretary of Natural Resources, filed a complaint against DuPont seeking the entry of an agreed Consent Decree. ECF No. 1. On April 20, 2017, after a period of notice and public comment, plaintiffs filed an Unopposed Motion to Enter the Consent Decree, along with a memorandum detailing the parameters of the proposed Consent Decree and responding to the public comments received. ECF Nos. 14, 15.

The proposed Consent Decree places three obligations on DuPont. First, DuPont will pay all unreimbursed costs associated with the assessment of natural resource damages, totaling $214,083.22.[2] Second, DuPont will pay a total of $42,069,916.78 to plaintiffs to be used for natural resource restoration projects. Third, DuPont will fund the renovation of the Front Royal fish hatchery to compensate for lost recreational fishing opportunities.[3] The parties summarize the settlement reflected in the Consent Decree as follows:

> Like any settlement, DuPont paid more than it thought required — approximately $57 million in total — and the Trustees recovered less than they would have liked. However, the

[1] On-site mercury remediation was mandated by the Hazardous Waste Management Permit for Corrective Action and Waste Minimization ("Correction Action Permit") issued by the United States Environmental Protection Agency on September 21, 1998. ECF No. 24-1. The Virginia Department of Environmental Quality issued a Corrective Action Permit in 2009, which expires on October 24, 2019. ECF No. 24-4, at 2-3. As noted below, this Corrective Action Permit was modified in 2014 to include off-site corrective action. ECF No. 24-4, at 7-8.

[2] In all, DuPont already has spent $7 million to fund the natural resource damages assessment studies. Joint Suppl. Mem., ECF No. 39, at 6 n.4.

[3] The parties estimate the renovation of the Front Royal fish hatchery to cost approximately $7-8 million. Joint Suppl. Mem., ECF No. 39, at 4-5.

> Trustees believe the funds recovered and the proposed in-kind project by DuPont, implemented in accordance with the Restoration Plan, are sufficient to address the injuries identified during the assessment process.

Joint Suppl. Mem., ECF No. 39, at 6. The proposed Consent Decree is the largest natural resource damages settlement in Virginia history.

In exchange, DuPont will obtain a covenant not to sue or take administrative action for natural resource damages resulting from the Waynesboro plant mercury contamination known as of the date of lodging of the Consent Decree. The proposed Consent Decree reserves certain rights to plaintiffs, including future actions against DuPont relating to mercury cleanup, or costs or damages that do not fall within the definition of natural resource damages. The proposed Consent Decree also reserves to plaintiffs the right to pursue natural resource damages of an unknown type or greater magnitude than known at the time of the entry of the Consent Decree. The parties represent that:

> Agreement was reached only after substantial scientific analysis of injuries caused by the mercury contamination, significant stakeholder input into the natural resource damage assessment process, and lengthy negotiations involving experienced counsel. The Decree provides for complete funding of the projects identified in the plan for restoring natural resources to their baseline condition, and avoids the significant expenditure of time and resources – as well as the delayed environmental benefit – that litigation would entail.

Mem. in Supp. of Unopposed Mot. to Enter Consent Decree, ECF No. 15, at 2.

Of significance to consideration of the approval of the proposed Consent Decree, in 1984, the Commonwealth of Virginia ("Virginia"), settled a claim with DuPont for natural resource damages and released DuPont from any claim for "damages incurred by the

Commonwealth for injury to, destruction of, or loss of natural resources with respect to the presence of mercury in the South River and the South Fork of the Shenandoah River which may have been caused by DuPont's discharge of mercury into those rivers resulting from the manufacture of acetate fibers during the period from 1929 to 1950."[4] The effect of the 1984 Release looms large in the legal risk-benefit analysis undergirding the proposed Consent Decree.

## II.

On May 5, 2017, the court issued an order setting a public hearing on the proposed consent decree and directing the parties to address certain issues raised in the public comments, including: the amount of the settlement; the expenditure of monies on mussel restoration; the impact of the settlement on the Waynesboro area; and the expenditure of monies on the Front Royal fish hatchery for smallmouth bass and other species propagation versus a trout grow-out facility in Waynesboro. ECF No. 19. The court also requested information on site remediation.

The court held a hearing on June 2, 2017. The parties presented testimony from a number of witnesses, including Melanie Davenport, Virginia Permitting Division Director, Virginia Department of Environmental Quality ("VDEQ"); Michael Liberati, leading DuPont's efforts at remediating the mercury contamination at its former Waynesboro plant; Anne M. Condon, Natural Resource Damage Assessment and Restoration Biologist, United States Department of Interior, Fish and Wildlife Service ("USFWS"); Gary Martel, Deputy

---

[4] This document, referred to as the "1984 Release," was docketed in a prior South River mercury contamination case. See Nat. Res. Def. Council, Inc. & Sierra Club v. E.I. du Pont de Nemours & Co., No. 5:05cv30013, ECF No. 6-2 (W.D. Va. Mar. 1, 2005).

4

Director, Virginia Department of Game and Inland Fisheries ("VDGIF"); Terry Short, Vice

Mayor, City of Waynesboro; and Molly Ward, Secretary of Natural Resources,

Commonwealth of Virginia. The court also heard public comments from interested citizens.

In addition to information presented in open court, the court viewed three South River sites:

(1) the Augusta Forestry Center in Crimora, Virginia, location of site-specific natural

resource damages studies; (2) riverbank mercury remediation projects in Waynesboro's

Constitution Park, adjacent to DuPont's former manufacturing facility; and (3) an example

of a fishing access project off Lyndhurst Road in Waynesboro.

### A.

Melanie Davenport, Director of the Permitting Division of the VDEQ, was the first

witness to testify at the hearing. Davenport provided background concerning mercury

contamination in fish downstream of the contaminated site and historic efforts to ameliorate

the problem. Davenport testified that it was initially thought that the mercury in the South

River would become covered with sediment and decline in fish tissue over time. When fish

tissue studies conducted in the late 1990s and early 2000s revealed that mercury

contamination continued at high levels, it became clear that additional steps needed to be

taken. The South River Science Team ("SRST")[5] was convened in 2001 to identify, manage

and reduce risks to the public from the Waynesboro mercury contamination.

---

[5] The SRST is an ongoing collaborative effort by DuPont, the United States Environmental Protection Agency, the VDEQ, the Virginia Department of Health, the VDGIF, various universities, local citizens groups, mercury contamination experts and other stakeholders. The SRST has met 4-5 times a year since 2001 and has had significant academic involvement, resulting in over 100 peer reviewed research publications and an associated 75 masters and doctoral degrees. From its office in Waynesboro and via its website, the SRST has educated and engaged the community on the mercury contamination, fish consumption advisory, and remediation/restoration efforts. Since its inception, DuPont has funded the work of the SRST, in an amount over $25 million.

Davenport also provided background on an earlier Consent Decree. The July 1, 2005,

Consent Decree approved the settlement of a lawsuit brought against DuPont by the

Natural Resources Defense Council, Inc. ("NRDC") and Sierra Club. The 2005

NRDC/Sierra Club Consent Decree[6] approved funding by DuPont of scientific studies of

mercury endangerment and abatement efforts based on those studies. See Nat. Res. Def.

Council, Inc. & Sierra Club v. E.I. du Pont de Nemours & Co., No. 5:05cv30013, ECF No.

15-1 (W.D. Va. June 29, 2005). The NRDC/Sierra Club Consent Decree was amended in

2014 to provide for the "implementation of a voluntary program of remediation that is safe,

effective, and reasonably necessary to address ecological and human health impacts caused

by mercury contamination." Id., ECF No. 20 (Sept. 14, 2014).

Michael Liberati, DuPont's Project Director for remediation and restoration at its

former Waynesboro site, testified about the substantial research undertaken by the SRST and

the eventual determination that bank erosion is the principal contributor to ongoing mercury

contamination of the South River. Liberati outlined the history of on-site remediation efforts

and detailed a pilot bank project designed to prevent further mercury contamination. Liberati

testified that the pilot project was very successful in that it resulted in a significant reduction

in mercury levels in near-bank settings. After the pilot project, work was commenced on the

banks of Waynesboro's Constitution Park, a bit downriver from the pilot site, which was

identified as having high concentrations of mercury and was eroding. Work was completed

on the bank stabilization project in Constitution Park in February 2017 and will continue in

---

[6] For ease of reference and to distinguish it from the proposed Consent Decree in this case, the court refers to the Consent Decree stemming from the 2005 National Resources Defense Council and Sierra Club lawsuit as the "NRDC/Sierra Club Consent Decree."

the city shops area of Waynesboro in August 2017. Employing adaptive management techniques and building on the positive results from the pilot program, the VDEQ has approved expansion of the bank stabilization program to encompass contaminated areas of the first two miles of the South River downstream from the former DuPont facility.

Anne M. Condon, Natural Resource Damage Assessment and Restoration Biologist with the USFWS, testified at length concerning natural resource damages resulting from the DuPont mercury contamination.[7] Condon has worked on the natural resource damage assessment for the former DuPont Waynesboro site since 2008 and has been its case manager since 2011, coordinating the injury assessment and restoration planning. Condon explained that the injury assessment and resulting Restoration Plan was subject to nearly ten years of study in two stages, injury evaluation and injury quantification.[8]

Condon testified that the injury evaluation stage began in 2005, focusing on the impacted area of the South River downstream of Waynesboro, as well as the South Fork of the Shenandoah River, comprising more than 125 river miles. The multi-year study evaluated mercury exposure and related effects in multiple bird species, reptiles and amphibians in the South River's aquatic and adjacent terrestrial habitats. Shorter studies were conducted on mercury exposure to bats and small mammals, and fish data was collected as part of a regular monitoring program. The process evaluated injury to four ecological resources — aquatic habitat, sediments, floodplain/upland habitat, and wetlands — by studying representative

---

[7] Condon also supplied a declaration in support of the Consent Decree, attaching the March 2017 Restoration Plan and Environmental Assessment for the DuPont Waynesboro – South River/South Fork Shenandoah River/Shenandoah River Site ("Restoration Plan"), March 2017, ECF No. 15-1, to be implemented by the Consent Decree.
[8] The damages assessment plan began in 2005 when a cooperative funding agreement was executed by DuPont and the Natural Resource Trustees ("Trustees") authorized under federal law to recover natural resource damages. See 42 U.S.C. § 9607(f)(1); 40 C.F.R. §§ 300.600, 300.605. The Trustees in this case are the Commonwealth of Virginia, Secretary of Natural Resources, and the United States Department of Interior, Fish and Wildlife Service.

resources consisting of fish, mussels, songbirds and amphibians. Lost recreational fishing also was evaluated. As regards fish, tissue samples showed elevated mercury levels in smallmouth bass and other warm water species.[9] See ECF No. 34, at 39. No mussels were present in the South River downstream of Waynesboro, although they were present upstream. Mussels provide benefit by filtering the water and adding structure to the river bottom. Condon testified that researchers collected data on mercury exposure in 50 different species of songbirds. Studies showed a 20% reduction in fledgling songbirds in mercury-contaminated swallow nests. As regards amphibians, researchers found a 68% reduction in productivity of the American toad in contaminated wetlands. Condon testified that these studies informed the calculated service loss for those categories of injured natural resources. To evaluate lost human use in the form of recreational fishing, an estimate was made of fishing trips lost and diminished due to the fish consumption ban and advisory.[10] Condon stated that they used Virginia fish license data and creel survey data to figure out the annual fishing pressure on the river and employed a literature review of papers that studied how anglers react to fish consumption advisories to derive the percentage of lost trips and avoided trips. The injury evaluation process lasted from 2005 to 2012, after which work on injury quantification began.

---

[9] Condon testified that similar data was not available for trout stocked by the VDGIF along roughly ten miles of the South River because those fish are caught in short order, not allowing for mercury accumulation. Condon added that while brook trout are native to tributaries of the South River, trout do not broadly represent the resources of the affected area because their habitat is specific to certain cooler water areas of the South River. As reflected below, many of the speakers in the public comment portion of the hearing disagreed. In fact, the most frequent criticism of the proposed Consent Decree and Restoration Plan was the decision to renovate the smallmouth bass hatchery in Front Royal as opposed to trout-specific projects, such as building a new trout grow-out facility in Waynesboro.

[10] The 1977 fish consumption ban was replaced in 1979 with a fish consumption advisory, which remains in place today and is applicable to all South River fish species, excluding stocked trout.

8

As Condon described, the purpose of the injury quantification process was to quantify the extent and magnitude of the loss over time and space and equate it with the gains expected from the restoration models. The Trustees engaged a resource economist at the Department of Interior, Office of Policy Analysis, to prepare habitat equivalency analysis ("HEA") and resource equivalency analysis ("REA") models to evaluate damages. "To address the wide range of service losses at the site, the Trustees developed a multi-pronged approach to damages determination: (1) HEA for the loss of riverine, floodplain, and wetland resources; (2) REA for the loss of migratory songbirds; (3) mussel propagation and replacement analysis; (4) recreational fishing losses using trip-equivalency analysis." Condon Decl., ECF No. 15-1, ¶ 16. Condon described the public involvement in the injury assessment and quantification process, including multiple meetings with stakeholders since 2008.

After studying the issue of injury quantification for two years, the Trustees and DuPont began settlement negotiations in 2015. "The parties disagreed over a number of issues, including the types and amount of natural resource damages, the scale and costs of appropriate restoration projects, and the extent of DuPont's legal liability." Id. ¶ 19. Once the parties agreed on a settlement amount and finalized the language of the proposed Consent Decree, the Trustees prepared a draft Restoration Plan that identified three restoration alternatives to compensate for injuries to natural resources.[11] After a public

---

[11] Alternative A provided no restoration options. Alternative B provided a wide range of restoration options. Alternative C included all of the Alternative B options, and added a trout management component.

notice and comment period,[12] a final Restoration Plan was approved by the Department of

the Interior, selecting Alternative B from among the three restoration alternatives. The

Trustees explained their selection of Alternative B as follows:

> The Trustees evaluated three restoration alternatives. Of these, Alternative B best addresses natural resource injuries and service reductions resulting from the release of mercury within the assessment area, and includes the majority of the project categories originally suggested by stakeholders. Based on the Trustees' evaluation of the environmental consequences of Alternatives A, B, and C, the NRDAR factors described in 43 C.F.R. § 11.82(d), and the potential for greater restoration project opportunities, the Trustees select Alternative B as their Preferred Alternative.
>
> Alternative A provides no restoration options, and is therefore insufficient to compensate for natural resource injuries.
>
> Alternative C provides all of the opportunities for restoration contained in Alternative B, as well as a trout management component. The trout project was considered because it is supported by stakeholders, provides a safe-for-consumption fishing alternative, and benefits a certain portion of the SR angler population. However, the benefits are almost exclusively directed at trout anglers, a population that did not suffer a direct negative impact from the mercury contamination in the watershed.
>
> Redirection of funds to complete a trout-only project would decrease funds available for restoration projects to improve water quality and fish habitat that would benefit all resources impacted by mercury. Those projects, agricultural and urban BMPs in the upper SR, headwater streams, and within the City of Waynesboro, will improve riparian and aquatic habitat,

---

[12] As part of the public comment process, a number of individuals wrote letters, which the court docketed, regarding the proposed Consent Decree. ECF Nos. 3, 5-9, 12. Many of the letters advocated redirection of the settlement proceeds towards projects promoting trout fishing. As such, the letters opposed spending monies on mussel propagation and restoration and renovation of the Front Royal fish hatchery in favor of trout specific projects.

benefitting multiple resources including fish. Alternative B would allow for more funding to be allocated to those types of projects.

Because there are three differently managed stocked fisheries in the SR that are already popular destinations (Bugas 2011), the benefits of additional trout stocking and management are not sufficiently clear. Trout stocking impacts are too narrow, given the more broad benefits expected from the other restoration projects proposed in Alternative B, to devote substantial resources to the proposed trout project. Finally, the recreational fishing access improvement projects contained in Alternative B will provide substantial benefits to anglers of all fish species in the SR and SFSR, including trout anglers.

The Trustees believe that the Preferred Alternative, Alternative B, represents cost-effective and beneficial means by which to restore or replace the injured natural resources and the services they provided. Based on the restoration alternative selected in the final RP/EA, Trustees will begin to identify and evaluate additional specific project options. Compliance with the laws cited above, and any necessary permitting, will be undertaken during the planning stages of specific restoration projects.

The Trustees may implement restoration project alternatives that are not specifically identified in the RP/EA, but are consistent with our restoration objectives. Each project will be evaluated against the same restoration priorities and factors described above, and, if needed, a further review of environmental consequences will be conducted.

Restoration Plan, ECF No. 15-1, Chapter 6, at 75-76.

Condon identified criteria for project selection, including: a connection to the injured resource, feasibility and cost effectiveness, likelihood of success and long term sustainability, and expected benefits. She indicated that there will be projects in Waynesboro, and that this settlement provided a great opportunity to do a lot of good for the watershed. Condon identified agricultural and urban best management practices to stabilize the stream bank and

prevent erosion. As regards spending money on the Front Royal fish hatchery instead of a Waynesboro trout grow-out facility, Condon stated that the Front Royal fish hatchery would be cost-effective, as the state owned the land and had staff on-site. Condon added that the suggested Waynesboro trout grow-out facility did not address the fish resource injured by the mercury contamination, noting that trout are not subject to the fish consumption advisory as they do not remain in the river long enough to accumulate mercury. Condon emphasized that the settlement funds should be directed at projects to restore natural resources damaged by the mercury, informing the Trustees' decision to devote resources to the renovation of the smallmouth bass fishery rather than a trout grow-out facility having little nexus to the injury. Condon also stated that mussel propagation had the added advantage of improving water quality. The Trustees intend to hold public meetings to continue working with various stakeholders to identify specific restoration projects located near the watershed and impacted areas within the categories outlined in the Restoration Plan. Condon indicated that the natural resource damage assessments were based on ten years of study and that, "[a]fter careful review and consideration of the comments received, the Trustees continue to believe that the proposed Consent Decree is fair and reasonable, consistent with natural resource damages regulations, and in the public interest." Condon Decl., ECF No 15-1, ¶ 27.

Gary Martel, Deputy Director of the VDGIF, testified that mussel restoration has proven successful in Virginia, citing the Clinch and Holston River areas. Martel noted that mussels are a high biomass foundation species that serve the important function of filtering river water, improving its quality. Martel testified that creel surveys conducted by his

department in 2005, 2011 and 2016 noted anglers' preference for black bass.[13] Martel stated that the VDGIF has stocked trout in the South River since 1989, and the mercury contamination fish consumption advisory does not apply to trout as they do not reproduce in the warm water below Waynesboro, and thus are not in the river long enough to acquire mercury in their tissue.[14] Martel testified that funding the Front Royal fish hatchery would be cost-effective, address the damage from mercury contamination to smallmouth bass, and help stabilize smallmouth bass population during lean reproductive years. Martel indicated that the Restoration Plan contemplates the addition of non-powered boating and fishing access sites, with a goal of having one every five to seven miles along the South River. Martel noted that the largest portion of the settlement funds is allocated to land acquisition, and the resulting improved water quality would benefit all species of fish, including trout.

Terry Short, Vice Mayor of Waynesboro, voiced his support for the proposed Consent Decree, indicating that the city expected to receive funding under the Restoration Plan for projects in Waynesboro, including the planned South River Preserve project.[15] Short testified that in a perfect world, he would prefer all of the settlement funds to come to Waynesboro, but felt the proposed Consent Decree was fair and in the public interest not only for Waynesboro, but for all affected communities.

---

[13] Smallmouth bass (Micropterus dolomieu) swim within the black bass (Micropterus) genus.

[14] As several members of the public commented, cold springs in tributaries of the South River upstream of Waynesboro provide trout habitat. Martel agreed, noting that the trout habitat diminishes in the warmer waters below Waynesboro. The recent removal of a dam upstream of Waynesboro has furthered the downstream expansion of the trout fishery into Waynesboro.

[15] Short's testimony mirrored a letter sent to the court by Michael G. Hamp II, City Manager of Waynesboro. In his February 28, 2017 letter, Hamp wrote: "The City Council of the City of Waynesboro, Virginia, respectfully encourages the Court to consider approval of the Consent Decree in its present form. As the most injured community, the City Council of the City of Waynesboro looks forward to working with Trustees to identify eligible signature projects that will not just benefit our community and our many damaged environmental resources, but the region as a whole. It is the opinion of the City Council of the City of Waynesboro that the Consent Decree is fair, reasonable, and in the public interest." ECF No. 12.

Molly Ward, Virginia's Secretary of Natural Resources, expressed her support and that of the Governor for the proposed Consent Decree. Ward indicated that from the Commonwealth of Virginia's perspective, the proposed Consent Decree met legal requirements, considered legal defenses and was based on ten years of solid scientific work. Ward was aware that "DuPont is going under some potential corporate restructuring and merger that might change the dynamic at DuPont." She also expressed concern that future administrative changes could cause additional delay for communities that have been suffering for decades. Secretary Ward closed by saying that "all of these things led me to believe that it was a good time to try to bring this issue to closure. The sooner we can get some projects on the ground for these communities to improve water quality, the sooner the habitats and the aquatic life can return, recover."

**B.**

At the June 2, 2017 public hearing, the court heard from a number of interested individuals, several whom had written the court earlier in the year. Many of the speakers were trout enthusiasts, interested in seeing Restoration Plan monies spent on a trout-specific projects in Waynesboro, including a proposed grow-out facility. For example, Urbie Nash, a South River resident, retired environmental engineer and member of the SRST, asked the court to be mindful of not wasting any of the limited settlement dollars, and noted that monies spent on mussels and smallmouth bass will not recreate the angling opportunities lost due to the mercury pollution. To that end, Nash urged that $2.5 million of the settlement proceeds be used for a trout grow-out facility in Waynesboro. Tommy Lawhorne agreed, indicating that given natural mortality, monies spent on the smallmouth bass fishery

14

would be wasted. Lawhorne, a Waynesboro resident and co-owner of the South River Fly Shop, indicated that there were native brook trout in the South River, and that the exclusion of monies for trout resources is neither fair nor adequate. Kevin Whitfield, a Rockingham County fly fishing outfitter, echoed Lawhorne's and Nash's concerns and also questioned the lack of priority being given to the City of Waynesboro, which he termed to be "ground zero" for mercury pollution. Jay Black, from Mathews County, caught his second trout, a brown variety, on the South River in Waynesboro. Black spoke of the efforts of the South River Fund for Cold Water Conservation to promote stream bank and trout habitat restoration, trout stocking in the South River, and education. Black reminded all present that the South River in Waynesboro was "on the receiving end of nothing short of a direct environmental blunt force trauma from DuPont's mercury," and the "failure to meaningfully and tangibly acknowledge this gross environmental defilement" would add insult to injury. Tom Benzing, a member of the SRST, Professor of Integrated Science and Technology at James Madison University and Trout Unlimited volunteer, spoke against funding a smallmouth bass fishery and mussel restoration. Rather, Benzing viewed the trout grow-out facility in Waynesboro as the only adequate mechanism to restore lost recreational fishing trips. Absent funding for the trout grow-out facility, Benzing considered the settlement to be fatally flawed and not in the public interest. Gary Collins, a volunteer for Project Healing Waters, an organization dedicated to the rehabilitation of disabled veterans through fly fishing, urged support for Alternative C and the Waynesboro trout fishery. In particular, Collins noted the unique opportunities for disabled veterans at the downtown Waynesboro fishery, including paved walkways, covered pavilions and, rare in Virginia, stairs with

15

handrails to access the river. Jim Josefson, a resident of the South River watershed and recreational angler, doubted the reasonableness of the settlement, citing the Restoration Plan's failure to include "lost nonuse values such as existence and bequest values" under 43 C.F.R. § 11.83, the lack of assessment of service losses to catch-and-release anglers, and an overly narrow application of regulatory criteria in the Restoration Plan emphasizing injured resources, resulting in the exclusion of trout specific projects in Alternative B. Josefson also raised concern about the lack of a total damages value against which to measure the amount of the settlement. Joe Ross, a former Trout Unlimited state officer and author, offered that the Waynesboro trout grow-out facility would introduce stronger and healthier fish. Phillip Musegaas, representing the Shenandoah and Potomac Riverkeepers Network, largely supported the settlement with the caveat that he did not think the renovation of the smallmouth fishery would restore fishing trips or otherwise make a difference and noted the data gap involving trout damages. Musegaas felt that part of the settlement monies should be reallocated to the trout grow-out facility.

Others spoke in favor of the proposed Consent Decree. Daniel Cristol, a Professor of Biology at The College of William and Mary, has studied the effects of mercury on birds in the South River habitat since 2005. Cristol stated that the impact on birds stemming from the South River mercury contamination is the worst recorded in the world. Cristol detailed the massive loss of birds since 1929, and opined that these objectively quantifiable losses will continue into the future. Cristol reported that the scientific data undergirding this settlement are "the most comprehensive and solid numbers ever used for a contaminant settlement." As regards the bird data, Cristol added that they were the result of more effort and study

than any other case of mercury pollution, and that this settlement will stand as a model for

research and collaborative restoration. Cristol opined that "this settlement could be better

because it could be a little bit bigger, it's not enough to restore all those birds, but I think it's

a very satisfactory settlement. A lot of good data and thought and good intentions were put

into it, and I think it will go a long way to restoring the resources that were lost due to

mercury." Peter Van Acker, of the Augusta Bird Club, voiced general support for the plan,

especially as it benefitted songbirds and provided for land acquisition. Van Acker expressed

an urgent need for action, and agreed that the trout community had reasonable points. Van

Acker referenced a much larger DuPont settlement over a chemical leak in West Virginia

and asked the court to take a big picture look. Aaron Revere stated that he was very much in

support of the settlement, and believed it provided for numerous miles of bank restoration,

improved water quality and other benefits. Revere believed the settlement to be in the public

interest. Finally, Jay Eiche, board member of Friends of the North Fork of the Shenandoah

River, disputed the notion that the smallmouth bass population is healthy and provided two

papers to that effect. Noting that while it was not perfect, Eiche considered Alternative B to

be a reasonable way to advance the interests of the community subject to damage.

## III.

Following the public hearing, on July 10, 2017, the court, citing United States v.

Montrose Chem. Corp. of Cal., 50 F.3d 741, 747 (9th Cir. 1995), directed the parties to file a

supplemental brief on the amount of the settlement identifying "the range of expected costs

calculated by the Trustees for completing restoration necessary to fully compensate for

natural resource damages." Order, ECF No. 35, at 4 (quoting Mem. In Supp., ECF No. 15,

at 15). The court also sought information on the parties' competing injury quantification analyses. On July 24, 2017, the parties filed a Joint Supplemental Memorandum in Support of Motion to Enter and a Supplemental Declaration of Anne M. Condon, ECF No. 39, responding to the court's inquiry.

The parties first addressed the range of expected restoration costs calculated by the Trustees. The Trustees confirmed that the settlement amount in this case was not reached based on a direct valuation of damaged resources. Rather, the natural resource damages model estimates the costs of projects that will "restore, replace or acquire the equivalent" of the injured natural resources. 42 U.S.C. § 9607(f)(1). The Trustees explained:

> To do so, the Trustees first evaluated the impact of mercury discharges on natural resources and quantified that injury using economic models. After quantifying the injury, the Trustees turned to identifying possible projects that could restore the same amount of ecological and human use services that were lost as a result of the mercury discharges, and estimating the costs of implementing those projects.

Joint Suppl. Mem., ECF No. 39, at 2. The restoration-based claim developed by the Trustees was designed to "equate the 'debit' (estimated losses) from the injury with the 'credit' (estimated benefits) from restoration projects, and ultimately determine the damages, which are the costs associated with implementing restoration projects." Suppl. Decl. of Anne M. Condon, ECF No. 39-1, ¶ 4. As outlined in the Restoration Plan, the Trustees are to select specific restoration projects within broad restoration categories. "Until projects are identified, selected, and implemented, the exact cost of restoration is uncertain. This is especially so because most of the project categories identified in the [Restoration Plan] involve purchase of property rights." Id. ¶ 5. Condon's supplemental declaration states that

18

"[f]or settlement purposes, the Trustee's preliminary calculations of the restoration costs for the Site resulted in a range of $40 million to $118 million, not including the costs of the Front Royal Fish Hatchery renovations to be undertaken directly by DuPont." Id. ¶ 7. As Condon explained, the breadth of this range was due to a number of factors inherent in the restoration cost valuation process, including wide variability in the estimation of restoration credits per acre and per project as well as potential project savings from the use of conservation easements, the opportunity to leverage other funding sources and fluctuation in monitoring, oversight and contracting costs. Id. ¶ 10.

DuPont's competing natural resource damage estimate was much lower than the one posed by the Trustees.

> In consultation with experts from a variety of fields, DuPont arrived at a restoration cost estimate of $17,534,000 in cash payments to cover most aspects of the injury, together with renovations to the Front Royal Fish hatchery and other recreational fishing projects to be completed by DuPont. While the estimated cost varied over time as the scope of these projects was refined, DuPont estimated that completing them would cost a total of between $10 and $15 million. Combined with the $17,534,000 cash payment, this gives a total restoration cost estimate of between $27,534,000 and $32,534,000. In DuPont's analysis, these payments and projects would have been sufficient to restore 100% of the natural resources lost due to mercury contamination in the South River and South Fork of the Shenandoah River.

Joint Suppl. Mem., ECF No. 39, at 4-5. In short, there was a wide gulf between the Trustees and DuPont as to the amount of cash that was necessary to fully restore the natural resources damaged by the mercury.

On behalf of the Trustees, Condon concluded:

> The proposed settlement is capable of achieving restoration to offset the calculated losses. However, the Trustees will need to carefully select projects for maximum recovery benefits and leverage opportunities for partnership with other organizations to ensure the most restoration for each dollar spent. Based on the information provided below and experience with implementing restoration at other sites, the Trustees believe that the proposed settlement can achieve full restoration of the injured resources and that it is feasible to identify restoration projects that will provide sufficient credits to offset the debit.

Suppl. Decl. of Anne M. Condon, ECF No. 39-1, ¶ 9.

## IV.

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Clean Water Act ("CWA"), authorize the state and federal governments — acting as natural resource trustees — to recover damages from parties responsible for discharges of hazardous substances for "injury to, destruction of, or loss of natural resources," including the costs of assessing such damages. 42 U.S.C. § 9607(a); 33 U.S.C. § 1321(f)(4). This compensation is over and above the costs of cleanup of the contamination, id., and any sums recovered from liable parties are "for use only to restore, replace or acquire the equivalent of such natural resources." 42 U.S.C. § 9607(f)(1); see also 33 U.S.C. § 1321(f)(5). The term "natural resources" is broadly defined under CERCLA and the CWA to include "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources," including the supporting ecosystems for such resources. See 42 U.S.C. § 9601(16); 40 C.F.R. §§ 300.600(a), (b).

The Trustees are required to employ a rigorous regulatory process to determine the amount of damages to natural resources. 43 C.F.R. § 11.80(b); 40 C.F.R. § 300.615. This

process "uses a planned and phased approach to the assessment of natural resource

damages." 43 C.F.R. § 11.13. Under this regulatory scheme,

> The measure of damages is the cost of (1) restoration or
> rehabilitation of the injured natural resource to a condition
> where they can provide the level of services available at baseline,
> or (ii) the replacement and/or acquisition of equivalent natural
> resources capable of providing such services. Damages may also
> include, at the discretion of the authorized official, the
> compensable value of all or a portion of the services lost to the
> public for the time period from the discharge or release until the
> attainment of the restoration, rehabilitation, replacement,
> and/or acquisition of equivalent of baseline.

43 C.F.R. § 11.80(b). The regulations consistently require the damage assessment to focus on

"the injured natural resources." See, e.g., 43 C.F.R. § 11.82(a).

Upon determination of the amount of natural resource damages, the Trustees are

tasked with developing a Restoration Plan.

> The Plan shall describe how the monies will be used to address
> natural resources, specifically what restoration, rehabilitation,
> replacement, or acquisition of the equivalent resources will
> occur. When damages for compensable value have been
> awarded, the Plan shall also describe how monies will be used to
> address the services that are lost to the public until restoration,
> rehabilitation, replacement, and/or acquisition of equivalent
> resources is completed.

43 C.F.R. § 11.93(a).

As the evidence presented at the hearing detailed, the Trustees engaged in several

years of site-specific studies on multiple species, evaluating mercury exposure and the

potential effects of that exposure. This research culminated in a Damage Assessment Plan

released to the public in 2011. Thereafter, the Trustees worked for several years calculating

the amount of damages and determining the appropriate type and amount of restoration

projects needed to compensate for natural resource damages. Throughout this process, the Trustees engaged with the SRST and other stakeholders. This engagement included the evaluation of proposed alternatives to remedy the natural resource damages.

After completing the injury quantification analysis, the Trustees and DuPont began negotiating a settlement of the natural resource damages claim in 2015. After negotiating for more than a year, the parties reached the agreement underlying the proposed Consent Decree.

When the proposed Consent Decree was lodged with the court on December 15, 2016, it attached an October 2016 proposed draft Restoration Plan. This draft Restoration Plan contained three alternatives. Alternative A provided for no action. Alternative B, ultimately selected by the Trustees, was identified as the preferred restoration alternative. Alternative C contained the same components as Alternative B, but allocated some funds to trout stocking and management. On April 20, 2017, after a public comment period, the parties filed an Unopposed Motion to Enter Consent Decree. ECF No. 14. The parties attached to their motion a March 2017 version of the Restoration Plan, adopting Alternative B and providing a detailed response to the public comments received. See Appendix D to Restoration Plan, ECF 15-1. By and large, these public comments mirrored those presented at the June 2, 2017 hearing.

## V.

A consent decree is "essentially a settlement agreement subject to continued judicial policing." Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir. 1983). "Consent decrees and orders have attributes both of contracts and of judicial decrees . . . . While they are arrived at

22

by negotiation between the parties and often admit no violation of law, they are motivated

by threatened or pending litigation and must be approved by the court." United States v.

ITT Cont'l Baking Co., 420 U.S. 223, 236 n.10 (1975); Szaller v. Am. Nat. Red Cross, 293

F.3d 148, 152 (4th Cir. 2002)(A "consent decree 'has elements of both judgment and

contract,' and is subject to 'judicial approval and oversight' generally not present in other

private settlements."(quoting Smyth v. Rivero, 282 F.3d 268, 279-80 (4th Cir. 2002))).

> Consent decrees are entered into by parties to a case after
> careful negotiation has produced agreement on their precise
> terms. The parties waive their right to litigate the issues involved
> in the case and thus save themselves the time, expense, and
> inevitable risk of litigation. Naturally, the agreement reached
> normally embodies a compromise; in exchange for the saving of
> cost and elimination of risk, the parties each give up something
> they might have won had they proceeded with the litigation.
> Thus the decree itself cannot be said to have a purpose; rather
> the parties have purposes, generally opposed to each other, and
> the resultant decree embodies as much of those opposing
> purposes as the respective parties have the bargaining power
> and skill to achieve.

United States v. Armour & Co., 402 U.S. 673, 681-82 (1971). A district court's "authority to

adopt a consent decree comes only from the statute which the decree is intended to

enforce," System Fed'n No. 91, Ry. Emp. Dep't v. Wright, 364 U.S. 642, 651 (1961), so that

the focus of the court's attention in assessing the agreement should be the purposes the

statute is intended to serve, rather than the interests of the parties to the settlement. See

Citizens for a Better Env't v. Gorsuch, 718 F.2d 1117, 1126 (D.C. Cir. 1983).

The purposes of CERCLA "include facilitating efficient responses to environmental

harm, holding responsible parties liable for the costs of the cleanup, and encouraging

settlements that reduce the inefficient expenditure of public funds on lengthy litigation."

B.F. Goodrich v. Betkoski, 99 F.3d 505, 514 (2d Cir. 1996) (internal citations omitted), overruled on other grounds by New York v. Nat'l Serv. Indus., Inc., 352 F.3d 682, 685 (2d Cir. 2003); see United States v. Monsanto Co., 858 F.2d 160, 170 (4th Cir. 1988) ("Throughout [CERCLA's] legislative history, there appears the recurring theme of facilitating prompt action to remedy the environmental blight of unscrupulous waste disposal."). Likewise, "[t]he objective of [the CWA] is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251; see Sierra Club v. ICG E., LLC, 833 F. Supp. 2d 571, 573 (N.D.W.V. 2011). There is little doubt that the proposed Consent Decree in this case is consistent with the purposes of CERCLA and the CWA.

## A.

In considering whether to enter the proposed Consent Decree in this case, the court must determine whether the Consent Decree is "fair, adequate, and reasonable and is not illegal, the product of collusion, or against the public interest." United States v. North Carolina, 180 F.3d 574, 581 (4th Cir. 1999).

> In considering whether to enter a proposed consent decree, a district court should be guided by the general principle that settlements are encouraged.  Nevertheless, a district court should not blindly accept the terms of a proposed settlement. . . . In considering the fairness and adequacy of a proposed settlement, the court must assess the strength of the plaintiff's case. While this assessment does not require the court to conduct a trial or a rehearsal of the trial, the court must take the necessary steps to ensure that it is able to reach an informed, just and reasoned decision. In particular, the court should consider the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and

> the experience of plaintiffs' counsel who negotiated the
> settlement.

Id. (internal citations and quotation marks omitted).

The policy to encourage settlements "has particular force where, as here, a

government actor committed to the protection of the public interest has pulled the laboring

oar in constructing the proposed settlement." United States v. Cannons Eng'g Corp., 899

F.2d 79, 84 (1st Cir. 1990).

> Respect for the agency's role is heightened in a situation where
> the cards have been dealt face up and a crew of sophisticated
> players, with sharply conflicting interests, sit at the table. That
> so many affected parties, themselves knowledgeable and
> represented by experienced lawyers, have hammered out an
> agreement at arm's length and advocate its embodiment in a
> judicial decree, itself deserves weight in the ensuing balance.
> The relevant standard, after all, is not whether the settlement is
> one which the court itself might have fashioned, or considers as
> ideal, but whether the proposed decree is fair, reasonable, and
> faithful to the objectives of the governing statute. Thus, the first
> layer of insulation implicates the trial court's deference to the
> agency's expertise and to the parties' agreement. While the
> district court should not mechanistically rubberstamp the
> agency's suggestions, neither should it approach the merits of
> the contemplated settlement de novo.

Id. This is certainly true in the environmental context. The presumption in favor of

voluntary settlement "is particularly strong where a consent decree has been negotiated by

the Department of Justice on behalf of a federal administrative agency like EPA which

enjoys substantial expertise in the environmental field." United States v. Akzo Coatings of

Am., Inc., 949 F.2d 1409, 1436 (6th Cir. 1991); see United States v. District of Columbia,

933 F. Supp. 42, 47 (D.D.C. 1996) ("[B]road deference should be afforded the EPA's

expertise in determining an appropriate settlement and to the voluntary agreement of the

parties in proposing the settlement.").[16]

After all, approval of a settlement via consent decree is not a trial. As such, "[t]he trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties." Citizens for a Better Env't, 718 F.2d at 1126. Indeed, approval of a settlement by entry of a consent decree "is not a decision on the merits or the achievement of the optimal outcome for all parties, but is the product of negotiation and compromise." United States v. Oregon, 913 F.2d 576, 580 (9th Cir. 1990).

**B.**

Plaintiffs argue that the proposed Consent Decree presents no suggestion of collusion or illegality. Rather, it was backed up by a decade of scientific study with significant stakeholder involvement along the way. The consideration of alternative restoration plans was transparent and subject to public comment, and the court should accord broad deference due to the extraordinary amount of scientific grounding for the alternative chosen by the Trustees. The settlement avoids a prolonged legal struggle and allows restoration efforts to begin immediately.

From its perspective, DuPont stated that it has worked cooperatively with the Trustees for a decade. The $42 million cash payment[17] was arrived at following an eighteen

---

[16] In the area of natural resource damages, the United States Department of the Interior, Fish and Wildlife Service, and the Virginia Secretary of Natural Resources wield similar expertise.

[17] The parties summarize DuPont's total financial contribution as being "approximately $57 million in total." Joint Suppl. Mem., ECF No. 39, at 6. "DuPont will pay $42 million in cash under the proposed Consent Decree in addition to

month period of negotiation based on substantial scientific research. DuPont agrees with the plaintiffs that the amount of the settlement was sufficient to support restoration of natural resources in the South River damaged by the mercury contamination. DuPont noted that it considered the risk of litigation and the desirability of expediting the cleanup to be important factors. DuPont expressly raised the significant legal issue posed by the impact of the 1984 Release by Virginia of DuPont for natural resource damages caused by the historic mercury discharge from its former Waynesboro plant. DuPont noted that the question of the effect of the 1984 Release would have been hotly litigated and taken years, and that the legal risk played an important role in the settlement negotiations. The legal impact of the 1984 Release is compounded by the statutory prohibition against double recovery for natural resource damages. See 42 U.S. C. § 9607(f)(1) ("There shall be no double recovery under this chapter for natural resource damages, including the costs of damage assessment or restoration, rehabilitation or acquisition for the same release and natural resource."). At the end of the day, DuPont determined to settle the case and get the Restoration Plan started. DuPont believes that the total amount of the settlement is fair and reasonable and will fully compensate for the injury.

In response to a question by the court at the hearing, the parties indicated that if the Consent Decree is not entered, the settlement reached by the Trustees with DuPont would be off the table, requiring the parties either to proceed with the lawsuit or negotiate a

---

the Front Royal Fish Hatchery project estimated to cost approximately $7-8 million. These payments are also in addition to the $7 million in natural resource damage assessment studies funded by DuPont." Id. at 6, n.4.

different deal.[18] Either alternative is fraught with uncertainty and delay. The costs, delay and uncertainty occasioned by litigating these issues weigh heavily in the court's calculus in considering the reasonableness and public interest of this settlement.

## C.

The fairness of the proposed Consent Decree should be assessed both from a procedural and substantive standpoint. Cannons Eng'g, 899 F.2d at 86; United States v. Davis, 261 F.3d 1, 23 (1st Cir. 2001). "To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness and bargaining balance." Cannons Eng'g, 899 F.2d at 86. There is little question that the process leading up to the proposed Consent Decree was transparent and fair. Over the course of the last decade, natural resource damages stemming from the mercury contamination have been extensively studied, with participation by scores of scientific experts, the SRST and other stakeholder groups. The proposed Consent Decree is grounded in the results of those many years of scientific study. After the proposed Consent Decree was lodged, public comment was sought regarding the suggested alternative Restoration Plans, and those comments were considered and addressed by the Trustees in the final Restoration Plan. The court docketed the written comments it received and held a public hearing on the proposed Consent Decree on June 2, 2017, at which the public was invited to provide comment. Several interested

---

[18] As the Ninth Circuit noted in the context of approval of a class action settlement, "it must be recognized that we are not presented with a choice between alternative remedies. Neither the district court nor this court is empowered to rewrite the settlement agreed upon by the parties. We may not delete, modify, or substitute certain provisions of the consent decree. Of course, the district court may suggest modifications, but ultimately, it must consider the proposal as a whole and as submitted. Approval must then be given or withheld. Our only alternatives on appeal are to vacate and remand upon a determination that the district court abused its discretion, or to affirm its judgment. In short, the settlement must stand or fall as a whole." Officers for Justice v. Civil Serv. Comm'n of San Francisco, 688 F.2d 615, 630 (9th Cir. 1982).

members of the public spoke at the hearing, and the court appreciates their efforts and values their thoughtful input.

There has been no hint of collusion between the plaintiffs and DuPont. Indeed, the years of scientific study, the ultimate dollar value of the settlement, the mission of the governmental entities charged with negotiating the settlement, the scope of the covenant not to compete and the involvement of the SRST and other interested stakeholders over the years assures the court that this settlement was not the product of collusion, undue influence or coercion. After filing of the lawsuit and lodging of the proposed Consent Decree, a 45-day public comment period was undertaken, after which the parties reviewed and evaluated the public comments. Further, the court held a public hearing on the proposed Consent Decree, allowing the public an additional opportunity to address their concerns. While the lack of settlement monies directed to trout-specific projects is the principal concern of those members of the public opposing the proposed Consent Decree, that concern raises no issue of procedural fairness.

"Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." Id. at 87. Put another way, "[i]n determining whether a decree is 'fair,' courts have considered the following: 'the strength of plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risk involved in the litigation if the settlement is not approved.'" Akzo Coatings, 949 F.2d at 1435. There is no question as to the responsibility of DuPont for the historic mercury contamination at its former Waynesboro plant. Nor is there any question as to the pervasive natural resource damages

caused by the presence of mercury in the South River ecosystem, as documented in years of exhaustive scientific study. Thus, placing the burden on DuPont to compensate for the natural resource damages is substantively fair. There is nothing in the record to indicate the settlement was reached in bad faith or was the result of collusion. The court finds that the proposed Consent Decree is substantively fair in that it requires DuPont to shoulder the burden for the damages to natural resources from its former Waynesboro plant.

## D.

To some extent, the issue of substantive fairness melds with that of the adequacy and reasonableness of the proposed Consent Decree. The evaluation of a consent decree's reasonableness is "a multifaceted exercise." Cannons Eng'g, 899 F.2d at 89. "Often cited factors bearing on reasonableness include the decree's likely efficaciousness as a vehicle for cleansing the environment; the extent to which it satisfactorily compensates the public for actual and anticipated costs of remedial and response measures; and the relative strength of the parties' litigating." United States v. Fort James Operating Co., 313 F. Supp. 2d 902, 910 (E.D. Wis. 2004) (citing Cannons Eng'g, 899 F.2d at 89). "Other possibly relevant considerations are the availability and likelihood of alternatives to the consent decree and the extent to which approval of it serves the public interest." Id. at 910 (citing United States v. BP Expl. & Oil Co., 167 F. Supp. 2d 1045, 1053 (N.D. Ind. 2001)).

In this case, there are really two issues. First, there is the issue of the amount of the settlement. Second, there is the issue of the exclusion of trout specific projects from the alternative Restoration Plan selected by the Trustees.[19]

As with any settlement, there is always a question of whether too much or too little has been paid to resolve the legal claims. While the years of scientific study make plain the continuing harm to natural resources posed by the former DuPont plant's mercury release, the amount of the monetary damages paid by DuPont is the subject of reasonable debate. Many factors weigh in the settlement calculus. Certainly, an important part of the trial of this case would have been waged between dueling teams of scientific and economic experts as to the appropriate methodology and measure of natural resource damages. The wide gulf between the restoration cost estimates of the Trustees and DuPont bears this out. Plainly, the Trustees recognized the risks inherent in proving natural resource damages subject to such grossly variable calculations.

> Based on this range, the Trustees have determined that the recovered funds and in-kind project to be completed by DuPont should be enough to support projects that provide for complete recovery of the losses calculated by the Trustees. In other words, the total recovery from DuPont should be sufficient to restore or replace all of the resources injured by the mercury contamination. To be sure, a higher settlement amount would allow for greater flexibility in restoration options, more allowance for contingencies, and likely faster implementation of projects. Nevertheless, the Trustees have determined that with careful management of settlement funds, selection of projects, and leveraging of joint opportunities, complete restoration can be achieved. Based on that analysis, and in light of the risks and

---

[19] Of course, these issues are not mutually exclusive. Had the settlement amount been larger and some monies allocated to trout specific projects, the opponents of the proposed Consent Decree may have had fewer qualms with monies being spent, for instance, on mussel restoration.

31

> further delay that would be faced through litigation, the
> Trustees determined that the settlement amount is appropriate.

Joint Suppl. Mem., ECF No. 39, at 3.

Although it is uncertain how a fact finder would have resolved the various issues, especially those associated with the valuation of natural resource damages, two things are certain. First, such a legal battle would have been costly, diverting monies from restoration. Second, such a legal battle, with likely appeals, would take years to play out, further delaying restoration efforts. At the hearing, the parties flagged for the court the significant legal issue of the 1984 Release, which had the potential of eviscerating Virginia's claim for any natural resource damages.

While no formal discovery has been undertaken since this lawsuit was filed in December 2016, the factual and legal issues have been fully developed. The parties are sophisticated and are represented by experienced and knowledgeable counsel. The factual basis for the natural resource damages assessment is grounded in many years of scientific study undertaken with substantial input from the public and various stakeholders.

In sum, given the years of research, scientific investigation, and negotiation by the Trustees and DuPont, as well as the cost, delay and uncertainty associated with litigation, the court cannot conclude that the amount of the settlement is unfair, inadequate or unreasonable. "The only imaginable alternative to settlement would be complex and probably lengthy litigation." Fort James, 313 F. Supp. 2d at 910. The court finds that the amount of monetary damages to be paid pursuant to the proposed Consent Decree,

grounded as it is on exhaustive scientific study and subject to a well-publicized damages assessment process, is fair, adequate and reasonable.

Some members of the public commented that the amount of the settlement was too little, but that was not the principal criticism voiced by opponents of the proposed Consent Decree. Rather, their concern was over the Restoration Plan Alternative B chosen by the Trustees. Specifically, the principal concern raised was that the chosen Restoration Plan did not include monies earmarked for trout-specific projects such as a trout grow-out facility in Waynesboro. Trout advocates voiced many reasons why allocating a portion of the settlement proceeds to trout-specific projects made sense to them. Eastern brook trout are indigenous to this area and thrive in the spring-fed waters above Waynesboro. Trout fishing in Waynesboro — indeed, in the shadow of the former DuPont plant — has been enhanced by the relatively recent removal of an upstream dam.[20] Rather than spend monies on a smallmouth bass fishery in Front Royal, many miles removed from ground zero of the Waynesboro mercury contamination, trout advocates urged that the money should be spent in Waynesboro on a trout fishery. Opponents stressed that monies spent on the Front Royal fishery would not compensate for fishing trips lost due to the mercury contamination, as adding additional smallmouth fingerlings to the South River would do little to spur additional fishing activity. Trout advocates were emphatic in their view that only monies devoted to trout-specific projects could begin to compensate for the injury caused to

---

[20] The Restoration Plan recognizes that "[a] year-round trout fishery now exists several miles upstream of Waynesboro and downstream through most of Waynesboro City limits, creating a destination trout fishery for many anglers. As the SR [South River] warms downstream, habitat becomes more suitable for warm-water fish species; community composition varies between upper and lower reaches of the SR reflecting the changes in habitat and water temperature." Restoration Plan, ECF No. 15-1, § 2.2.2.

recreational fishing by the mercury contamination. The trout advocates also were skeptical of settlement monies being spent on mussel restoration, believing it to be a risky proposition.

To be sure, the trout community raises legitimate concerns. A trout fishery in Waynesboro would undoubtedly be a boon to the area hit hardest by the mercury contamination and would enhance sport fishing in the area. There is value, too, in promoting indigenous species.[21]

The Trustees expressly considered enhancing trout fishing opportunities but ultimately concluded that recreational trout fishing did not suffer any losses due to mercury contamination. As such, the Trustees counter that the scientific studies do not support restoration damages being devoted to trout-specific projects, as the data do not show mercury accumulation in trout. Again, because trout in the South River are stocked and fished out, the trout do not stay in the river long enough to absorb the mercury. As such, the South River fish consumption ban and advisory apply to fish species other than trout. The Trustees point out that monies spent by DuPont to renovate the existing fishery in Front Royal would benefit the South River as smallmouth and other species grown there would be placed in the South River and elsewhere. The Trustees note that the Front Royal renovation would be cost-effective, as the fishery is already staffed by VDGIF personnel and no real estate acquisition is required. The Trustees countered the criticism of mussel restoration by noting its success elsewhere in Virginia and the benefit to water quality by the water filtering capabilities of mussels. The Trustees pointed out that improvement to water quality from

---

[21] The Trustees note that while eastern brook trout are native to this area, "[t]he current trout fishery is the result of stocking efforts by the VDGIF and partner organizations which began over a decade after the mercury contamination was discovered and the fish consumption advisory put in place." Mem. in Supp. of Unopposed Mot. to Enter Consent Decree, ECF No. 15, at 16.

34

mussel restoration and other non-species specific aspects of the Restoration Plan, such as land acquisition, helps all South River species, including trout. The Trustees were hesitant to devote settlement proceeds to trout-specific projects, as the data did not support mercury contamination in stocked trout, and trout were not present throughout the affected areas downstream of Waynesboro. Rather, the Trustees determined that the monies would be best spent on projects directed at restoration of natural resource damages benefitting the entire river ecosystem and its inhabitants. In this regard, the Trustees determined that spending $2.5 million of the settlement proceeds on trout-specific projects would not be in the public interest, as it would decrease the amount of monies available to improve water quality and fish habitat for all species.

As the Restoration Plan makes clear, under Alternative C, allocating $2.5 million to trout management projects would reduce the amount of money allocated to wider projects to improve water quality and fish habitat. The Restoration Plan describes this category of projects as those "that improve water quality and habitat for native fish in the watershed through restoration actions such as planting riparian vegetation, stabilizing eroding banks, sedimentation control devices, improving in-stream habitat, installing alternative watering sources, excluding cattle from accessing the streams and other such agricultural BMPs [Best Management Practices]". Restoration Plan, ECF No. 15-1, § 5.3.1. Under Alternative B, these water quality projects are funded at the $10 million level, whereas Alternative C, funding trout specific projects in the amount of $2.5 million, reduces monies available for broader water quality and fish habitat projects by that same amount — to $7.5 million. See id. §§ 5.3 and 5.4. In short, rather than allocate settlement proceeds to benefit the only species

of fish not covered by the fish consumption ban and advisory, the Trustees chose to spend money on projects that would improve water quality and habitat for all species of fish in the South River ecosystem. It is difficult to discern how such a decision could run counter to the broader public interest.

On balance, while the trout community's concerns about exclusion of monies for trout-specific projects have some merit, the court is "not willing to scrap on this basis the positive features of the settlement," Fort James, 313 F. Supp. 2d at 910-11, including $10 million for agricultural and urban best management practices to improve water quality and fish habitat; $4 million for freshwater mussel propagation; $2.5 million for habitat protection for neotropical migratory songbirds; $19.5 million for land protection, property acquisition, and recreational and wildlife enhancements; and $2.5 million for recreational fishing improvement projects.[22] In sum, while the Restoration Plan does not fund a trout grow-out facility in Waynesboro, that omission does not convince the court that the proposed Consent Decree is not fair, adequate, reasonable and consistent with law. Taken as a whole, the settlement reflected in the proposed Consent Decree meets all of these requirements.

Finally, the court must consider the public interest. The amount of the settlement is substantial, being the largest natural resource damage recovery in the history of Virginia. The settlement is not the product of a rush to judgment; rather, it is grounded on years of scientific study and detailed damage assessment efforts. The amount of the cash payment negotiated in the settlement — $42 million — is more than twice DuPont's estimate,

---

[22] The remaining portion of the $42 million cash payment will be used by the Trustees for project planning, oversight and administration. Restoration Plan. ECF No. 15-1, at 43.

$17,534,000, of the cash payment necessary for complete natural resource damage restoration. It is also within the range, albeit at the very bottom, of the Trustee's preliminary calculations of estimated restoration costs.[23] It was negotiated by sophisticated parties with well-experienced legal counsel. Negotiating for the plaintiffs are federal and state agencies wielding enormous technical expertise, which are charged with the duty to act in the public interest. At the end of the day, the Trustees aver that they "believe that the proposed settlement can achieve full restoration of the injured resources." Suppl. Decl. of Anne M. Condon, ECF No. 39-1, ¶ 9.

Over the years, the SRST and other members of the local community have been deeply involved in the process and are committed to restoring the damaged natural resources. The Trustees have pledged to fully assess restoration activities directed at Waynesboro.[24] For this reason, the City of Waynesboro urges approval of the proposed Consent Decree.

Approval of the proposed Consent Decree will allow restoration activities to commence immediately and not be subject to delay occasioned by years of litigation, focusing on the contentious issues of the proper methodology and valuation of natural resource damages and the effect of the 1984 Release. Approval of the proposed Consent

---

[23] "For settlement purposes, the Trustees' preliminary calculations of the restoration costs for the Site resulted in a range of $40 million to $118 million, not including the costs of the Front Royal Fish Hatchery renovations to be undertaken directly by DuPont." Suppl. Decl. of Anne M. Condon, ECF No. 39-1, ¶ 7.

[24] "The Trustees anticipate partnering with various stakeholders, including the City of Waynesboro, to identify specific projects that will maximize restorative impact to the injured resources for funds expended and meet the requirements of the Restoration Plan." Mem. in Supp. of Unopposed Mot. to Enter Consent Decree, ECF No. 15, at 16. Such broad scope restoration projects, combined with the ongoing remediation success along the banks of the South River at Waynesboro's Constitution Park, cannot help but address and enhance the value of the affected areas consistent with the regulatory framework, including, for example, nonuse values such as existence and bequest values. See 43 C.F.R. § 11.83.

Decree also avoids the uncertainties associated with renegotiating the deal with a potentially restructured corporate entity.

While there is some risk associated with settling the natural resources damages claim before the permitted mercury remediation efforts are completed, there is an offsetting benefit to beginning natural resource restoration now, rather than waiting years for completion of the remediation work. This risk is further ameliorated by the fact that the proposed Consent Decree contains the following special reservation regarding natural resource damages:

> Notwithstanding any other provision of this Decree, the United States and the State each reserves the right to institute proceedings against DuPont in this action or in a new action seeking recovery of Natural Resource Damages if conditions are discovered or information is received relating to the Site, not known to the Trustees at the time of lodging of this Decree, that, together with any other relevant information, indicates that there is injury to, destruction of, or loss of natural resources of a type unknown, or a magnitude greater than was known, by the Trustees as of the date of lodging of this Decree.

Proposed Consent Decree, ECF No. 2-1, ¶ 52. This reservation preserves to the Trustees the ability to recover natural resource damages unknown, or of a magnitude greater than known, when the proposed Consent Decree was lodged, providing additional benefit to the public from unknown harm.

**VI.**

On balance, the court finds the proposed Consent Decree to be fair, adequate, and reasonable, and is not illegal, the product of collusion, or against the public interest. As such, the proposed Consent Decree is **APPROVED** and will be **ENTERED**.

ENTER: This 28ᵗʰ day of July, 2017.

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge